JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Gregory Snyder; 2012 West Grace Street Richmond, Va 23220

## DEFENDANTS
Harry F. Shultz; 435 Komen Ct. Collegeville, PA19426
Queue in the Cloud, LLC d/b/a BC in the Cloud; 3238 W. Germantown Pike, Eaglesville Pa 19403

**(b)** County of Residence of First Listed Plaintiff    Richmond County Virgina
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Montgomery County PA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Gregory C. Littman; Freundlich & Littman 1425 Walnut Street Suite 200 Philadelphia Pa 19102

Attorneys *(If Known)*
Kimberly L. Russell; Kaplan Stewart; 910 Harvest Drive Union Meeting Corporate Center P.O. Box 3037 Blue Bell PA 19422

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☐ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | | PTF | DEF |
|---|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C.A § 1332

Brief description of cause:
Breach of Operating Agreement Partnership Freeze-out

## VII. REQUESTED IN COMPLAINT:
- ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE          DOCKET NUMBER

DATE   1/29/18

SIGNATURE OF ATTORNEY OF RECORD

JAN 30 2018

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

**UNITED STATES DISTRICT COURT**

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: _2012 West Grace Street, Richmond Va 23220_

Address of Defendant: _435 Komen Ct. Collegeville PA 19426; 3238 W. Germantown Pike Eagleville, PA 19403_

Place of Accident, Incident or Transaction: _3238 West Germantown Pike Eagleville PA19403_
(Use Reverse Side For Additional Space)

**18  353**

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))   Yes☑  No☐

Does this case involve multidistrict litigation possibilities?   Yes☐  No☑
RELATED CASE, IF ANY:
Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐  No☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐  No☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐  No☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐  No☑

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. Federal Question Cases:
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   (Please specify) _____

B. Diversity Jurisdiction Cases:
1. ☑ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

**ARBITRATION CERTIFICATION**
(Check Appropriate Category)
I, _Gregory C. Littman_, counsel of record do hereby certify:
☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☐ Relief other than monetary damages is sought.

DATE: _1/29/18_   _____   _306806_
                    Attorney-at-Law      Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**JAN 30 2018**

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _1/30/18_   _____ G Littman_   _306806_
                    Attorney-at-Law                Attorney I.D.#

CIV. 609 (5/2012)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Gregory Snyder | : | CIVIL ACTION |
| | : | |
| v. | : | **18**   **353** |
| Harry F. Shultz | : | |
| Queue in the Cloud d/b/a BC in the Cloud | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.     (  )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.     (  )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.     (  )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.     (  )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)

(f) Standard Management – Cases that do not fall into any one of the other tracks.     (✕)

| | | |
|---|---|---|
| _1-29-18_ | Gregory C. Littman | Gregory Snyder |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-545-8500 | 215-545-8510 | Gregory@freundlichandlittman.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

JAN 30 2018

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Gregory Snyder | : | |
| Individually and as a Shareholder of | : | |
| Queue in the Cloud LLC | : | |
| 2012 West Grace Street | : | |
| Richmond, VA 23220 | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| Harry F. Shultz, | : | |
| 435 Komen Ct. | : | NO._____ |
| Collegeville, PA 19426 | : | |
| | : | |
| -And- | : | |
| | : | |
| Queue in the Cloud, LLC. | : | |
| d/b/a BC in the Cloud | : | |
| 3238 W. Germantown Pike | : | |
| Eagleville, Pennsylvania 19403 | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

## CIVIL COMPLAINT

Gregory Snyder ("Plaintiff Snyder"), individually and as a fifty percent (50%)

shareholder of Queue in the Cloud LLC ("Queue in the Cloud"), seeks compensatory and

punitive damages, and equitable relief, on behalf of himself and Queue in the Cloud concerning

the ongoing fraudulent misconduct of Defendant Harry F. Shultz ("Defendant Shultz"). After

Plaintiff Snyder challenged Defendant Shultz's ongoing misconduct that economically benefitted

Defendant Shultz's position at Plaintiff Snyder's expense and his breaches of fiduciary duties to

Queue in the Cloud and to Plaintiff Snyder, as a fifty percent (50%) shareholder, Defendant

Shultz pretextually and retaliatory terminated Plaintiff Snyder as Queue in the Cloud's Managing Director of Sales.

## PARTIES

1.      Plaintiff Snyder, an adult individual, whom resides at 2012 West Grace Street, Richmond Virginia 23220.

2.      Derivative Plaintiff Queue in the Cloud, whose claims are brought by Plaintiff Snyder as Queue in the Cloud's fifty percent (50%) shareholder, is a Corporation with its principle place of business and corporate headquarters at 3238 West Germantown Pike, Eagleville, Pennsylvania 19403.

3.      Defendant Shultz, an adult individual, whom resides at 435 Komen Court, Collegeville Pennsylvania 19426.

4.      Queue in the Cloud is also a Defendant to this action brought by Plaintiff Snyder, so Plaintiff Snyder may recover monies owed to him.

## PLAINTIFF'S STANDING TO PROTECT QUEUE IN THE CLOUD'S INTEREST

5.      Plaintiff Snyder is a fifty percent (50%) shareholder in Queue in the Cloud, and one of its only two shareholders.

6.      Defendant Shultz is also a fifty percent (50%) shareholder in Queue in the Cloud, and its other shareholder.

7.      Plaintiff Snyder has standing to bring this action individually and derivatively, including for the benefit of Queue in the Cloud, to redress past and future damages caused by Defendant Shultz's ongoing misconduct and breaches of fiduciary duties.

8.      Plaintiff Snyder will adequately and fairly represent Queue in the Cloud's interests in enforcing and prosecuting its legal rights.

9.      As part of Defendant Shultz's illegal and fraudulent actions, he manipulated

Queue in the Cloud without a board of directors. Therefore, no demand can be made upon Queue

in the Cloud's board to bring this suit. However, Plaintiff Snyder made pre-suit demands upon

Defendant Shultz to protect Queue in the Cloud clients and potential clients as well as to release

funds owed to Plaintiff Snyder.

10.     Defendant Shultz's misconduct is therefore deemed interested, and he is unable to

make an impartial decision regarding any demand to file suit. Therefore, and additional demand

is, as a matter of fact and law, futile and excused.

## JURSIDICTION AND VENUE

11.     Plaintiffs hereby incorporates the preceding paragraphs by reference as though

fully set forth at length herein.

12.     This Court has subject matter jurisdiction over this civil action pursuant to 28

U.S.C. §1332(a) in that the matter in controversy exceeds the sum or value of $75,000.00,

exclusive of interests and costs, and the matter is between citizens of different States.

13.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §

1391(a) in that a substantial part of the events or omissions giving rise to the claim occurred in

this judicial district and/or that the parties contractually agreed to the selection of this judicial

district as the appropriate venue for this within civil action.

## FACTUAL BACKGROUND

14.     Plaintiff Snyder hereby incorporates the preceding paragraphs by reference as

though fully set forth at length herein.

First Operating Agreement v. Second Operating Agreement

15.     Plaintiff Snyder and Defendant Shultz entered into an Operating Agreement for Queue in the Cloud LLC on January 1, 2012, (hereinafter "First Operating Agreement"). (A true and correct copy of the First Operating Agreement is attached hereto as **"Exhibit A"**).

16.     On or about December 14, 2017, Defendant Shultz showed Plaintiff Snyder a Second Operating Agreement for Queue in the Cloud LLC (hereinafter "Second Operating Agreement") that was supposedly entered into on January 1, 2012, the same date that the First Operating Agreement was executed. Upon information and or belief, the Second Operating Agreement shown to Plaintiff Snyder is a fraudulent document. (A true and correct copy of the Second Operating Agreement is attached hereto as **"Exhibit B"**).

17.     The Second Operating Agreement is identical to the First Operating Agreement in that the Articles and Sections are the same in every way, but the exhibits attached to the Second Operating Agreement below the signature lines have been replaced and/or changed. (**See Exhibit A** and **Exhibit B**).

18.     Both the First and Second Operating Agreements have two exhibit sheets attached to them which are referenced throughout the First and Second Operating Agreement. (**See Exhibit A** and **Exhibit B**).

19.     Exhibit A of the First Operating Agreement lists two members, Plaintiff Snyder and Defendant Shultz. Exhibit A also lists the initial capital contributions of both Plaintiff Snyder and Defendant Shultz as $0.00, as well as the percentage interest that both Plaintiff Snyder and Defendant Shultz received for their initial capital contribution as fifty (50) percent respectively. (**See Exhibit A**).

20.     Exhibit A of the Second Operating Agreement lists two members, Plaintiff Snyder and Defendant Shultz, but Exhibit A now lists the capital contributions of both Plaintiff Snyder and Defendant Shultz instead of their initial capital contributions. Plaintiff Snyder's capital contribution is listed as $56,760.62 and Defendant Shultz's capital contribution is listed as $81,926.62. Exhibit A also lists the percentage interest that both Plaintiff Snyder and Defendant Shultz received for their capital contribution as forty-one (41) percent for Plaintiff Snyder, and fifty-nine (59) percent for Defendant Shultz. (**See Exhibit B**).

21.     Exhibit B of the First Operating Agreement lists the elected officers of Queue in the Cloud. Exhibit B of the First Operating Agreement states that there are no elected officers of Queue in the Cloud. (**See Exhibit A**).

22.     Exhibit B of the Second Operating Agreement also lists the elected officers of Queue in the Cloud. Exhibit B of the Second Operating Agreement states that Defendant Shultz is the President of Queue in the Cloud. (**See Exhibit B**).

23.     On December 14, 2017, Defendant Shultz presented Plaintiff Snyder with the Second Operating Agreement and informed Plaintiff Snyder that due to the difference in the capital contributions listed in Exhibit A, Defendant Shultz was now the President of Queue in the Cloud and as President of Queue in the Cloud pretextually terminated Plaintiff Snyder's employment.

The Break Down of Partnership Relations

24.     When Queue in the Cloud was formed on January 1, 2012, Plaintiff Snyder took the title of Sales and Client Services. Defendant Shultz took the title of Platform and Client Services.

25.     When Queue in the Cloud was formed Plaintiff Snyder's main responsibility was to generate sales and bring in new clients. Defendant Shultz's main responsibility was to oversee Queue in the Cloud's day to day operations. In addition to Defendant Shultz's main responsibility, Defendant Shultz was tasked with overseeing the infrastructure and technical development of Queue in the Cloud services. Both Plaintiff Snyder and Defendant Shultz were also tasked with developing the User Interface and Key Features for Queue in the Cloud Services.

26.     Shortly after the formation of Queue in the Cloud it became apparent not only to Plaintiff Snyder and Defendant Shultz, but to those who worked with them as well, that Defendant Shultz lacked the experience and knowledge to fulfill his shared responsibility of developing the User Interface and Key Features for the Queue in the Cloud services.

27.     Once it became apparent that Defendant Shultz would not be able to fulfill all of his obligations that he had agreed to be responsible for with Queue in the Cloud, he began to defame Plaintiff Snyder to other employees of Queue in the Cloud. This defamation occurred not only in backdoor closed meeting, but in the general office environment as well.

28.     In an effort to interfere with Plaintiff Snyder's relationship with Queue in the Cloud, Defendant Shultz delegated out his work responsibilities and retreated to the back office of Queue in the Cloud where he unilaterally took on the sole responsibility of maintaining the books of Queue in the Cloud.

29.     To further interfere with Plaintiff Snyder's relationship with Queue in the Cloud, Defendant Shultz started to hire personal friends of his in an effort to isolate and intimidate Plaintiff Snyder. Shortly thereafter, when Plaintiff Snyder began to challenge Defendant Shultz's

decisions as an equal partner, Defendant Shultz informed Queue in the Cloud employees that they did not have to listen to Plaintiff Snyder.

30.     Over the course of the next four years, Defendant Shultz began to slowly freeze-out Plaintiff Snyder from Queue in the Cloud operations. Defendant Shultz began to unilaterally make decisions concerning Queue in the Cloud spending, marketing and product design. All of these actions were done in violation of the First Operating Agreement and done in bad faith in an effort to convince Queue in the Cloud employees that Plaintiff Snyder was nothing more than an employee whose position could be terminated at will.

31.     On or about January 1, 2017, Defendant Shultz unilaterally changed his job title to Managing Director to further convince the employees of Queue in the Cloud that he was in charge of Queue in the Cloud and that Plaintiff Snyder worked for him.

32.     On December 14, 2017, once Defendant Shultz believed he had convinced the employees of Queue in the Cloud that he was in fact in charge, he called Plaintiff Snyder and told him he was terminated.

33.     Plaintiff Snyder's immediately lost access to both his company phone number and his company email.

34.     Most importantly on December 14, 2017, the day of Plaintiff Snyder's termination, Defendant Shultz unilaterally removed Plaintiff Snyder from the jointly-held Queue in the Could bank account in clear violation of the First Operating Agreement.

Subsequent Actions of Defendant Shultz

35.     Since the date of Plaintiff Snyder's wrongful termination on December 14, 2017, Mr. Snyder has lost access to his company email, his company phone line and contact to his and Queue in the Cloud current and potential clients.

36.    Additionally, on or about the date of Plaintiff Snyder's wrongful termination

Defendant Shultz terminated Plaintiff Snyder's family health insurance plan without notice.

37.    Furthermore, Plaintiff Snyder has not received his monthly ten-thousand-dollar

($10,000.00) disbursement from Queue in the Cloud.  Upon information and belief, Plaintiff

Snyder believes that he will no longer receive the monthly disbursements from Queue in the

Cloud to which he is entitled.

38.    On December 22, 2017, Counsel for Plaintiff Snyder mailed a pre-suit demand

letter to Mr. Shultz and Queue in the Cloud Demanding among other things that Plaintiff Snyder

be given:

   a.   His access to any company bank accounts be reinstated;
   b.   His access to his company email be reinstated;
   c.   His access to his company phone line be reinstated;
   d.   His access to the normal monthly distributions be reinstated and paid by the fifth
        (5th) day of each month; unless there are unforeseen delays in receivables in which
        case the monthly distribution will be paid after the monthly costs of day to day
        operations have been met; and
   e.   Any end of year funds in excess of what is needed for the day to day operating
        costs of Queue in the Cloud LLC for January of the upcoming year will be
        distributed pro rata to each member by the tenth (10th) day of January; this
        demand includes the current year. (A true and correct copy of Plaintiff Snyder's
        Pre-Suit Demand Letter is attached hereto as "**Exhibit C**").

39.    On January 8, 2018, Counsel for Queue in the Cloud Kimberly L. Russell, Esq.[1]

responded to Plaintiff Snyder's Demand stating that, "Per the express terms of the Company's

Operating Agreement and due to Mr. Snyder's inability to make capital contributions as

required, Mr. Shultz currently holds a fifty-nine percent membership interest in the Company".

As such, Plaintiff Snyder is not entitled to jointly and unanimously approve certain Company

---

[1] Attorney Kimberly L. Russel, Esquire represented both Plaintiff Snyder and Defendant Shultz together in their individual capacities in a prior law suit. See. Continuity Logic LLC v. Snyder 2:13-cv-06468.

actions and directives. (A true and correct copy of Kimberly L. Russel, Esq.'s Response to the Plaintiff's Demand is attached hereto as "**Exhibit D**").

40.    Plaintiff Snyder upon information and belief, believes that Ms. Russell's response is based on her interpretation of the Second Operating Agreement which Plaintiff Snyder avers to be fraudulent.

41.    Plaintiff Snyder as a means of last resort filed this Civil Action.

## COUNT I
### Declaratory Judgement
### All Plaintiffs v. All Defendants

42.    Plaintiffs hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

43.    This Count is brought pursuant to the Declaratory Judgment Act, 42 Pa. C.S.A. § 7531 and Pa.R.C.P. 1602, asking this Court to interpret the First and Second Operating Agreement and construe their validity under the Declaratory Judgment Act, Specifically 42 Pa. C.S.A § 7533.

44.    A declaratory judgment may be obtained as to the interpretation of a document and as to the rights of the parties under it. *County Amusement Co. Johnstown Schiff's, Inc.*, 37 Pa. S. & C.2d (C.P. 1965).

45.    A more appropriate or available and established remedy is not available for the Plaintiffs without the Court first interpreting the Parties' rights pursuant to the First and Second Operating Agreement.

46.    Compelling and unusual circumstances exist in that the Defendant Shultz has presented a Second Operating Agreement to the Plaintiff Snyder, which Plaintiff Snyder reasonably believes to be a fraudulent document that he never entered into.

47.     There is no dispute as to the facts and the exhibits attached to the First Operating

Agreement, but there is a dispute to the validity of the Second Operating Agreement.

48.     The Court Declaring that the First Operating Agreement is valid and that the

Second Operating Agreement is a fraudulent document will help end the controversy.

49.     Furthermore, declaring that the First Agreement is valid and binding will help

prevent the Plaintiffs from suffering further harm.

50.     As stated above, Defendant Shultz has breached his obligations pursuant to the

First Operating Agreement and continues to operate Queue in the Cloud without paying his legal

obligations to Plaintiff Snyder and/or allowing the Plaintiff Snyder to participate in the business

of Queue in the Cloud.

51.     Therefore, it is requested that this Honorable Court interpret the First and Second

Operating Agreements and establish that the First Operating Agreement is a valid and

enforceable document and that the Second Operating Agreement is a fraudulent document as

such void and unenforceable.

WHEREFORE, Plaintiff Snyder respectfully requests that this Honorable Court issue and

Order declaring the First Operating Agreement valid and enforceable between Plaintiff Snyder

and Defendant Shultz.

## COUNT II
### Breach of Contract
### Plaintiff Snyder v. Plaintiff Shultz

52.     Plaintiff Snyder hereby incorporates the preceding paragraphs by reference as

though fully set forth at length herein.

53.     As mentioned above, on January 2, 2012, Plaintiff Snyder and Defendant Shultz entered into the First Operating Agreement whereby Plaintiff Snyder received a fifty (50) percent interest in Queue in the Cloud.

54.     At all times relevant hereto, Plaintiff Snyder was in full compliance with the terms of the First Operating Agreement.

55.     In accordance with the First Operating Agreement Plaintiff Snyder was not required to make any capital contributions to Queue in the Cloud unless he agreed to. (**See Exhibit A**).

56.     On a number of dates which will be determined during the course of discovery Defendant Shultz allegedly made certain capital contributions to Queue in the Cloud.

57.     In violation of the First Operating Agreement Defendant Shultz then increased his interest in Queue in the Cloud by lowering Plaintiff Snyder's ownership interest.

58.     Based upon these alleged capital contributions Defendant Shultz then unilaterally appointed himself as president of Queue in the Cloud and terminated Mr. Snyder.

59.     The First Operating Agreement clearly states that both Plaintiff Snyder and Defendant Shultz have an equal ownership interest of fifty (50) percent. (**See Exhibit A**).

60.     As such, Plaintiff Snyder is entitled to manage the affairs of Queue in the Cloud with Defendant Shultz.

61.     By terminating Plaintiff Snyder's employment with Queue in the Cloud and unilaterally managing the affairs of Queue in the Cloud, Defendant Shultz is in breach of the First Operating Agreement. (**See Exhibit A**).

WHEREFORE, Plaintiff Snyder respectfully demands judgment in his favor against the

Defendant in an amount in excess of $75,000.00, plus interest, costs, and any other relief that this

Honorable Court deems just and appropriate.

**COUNT III**
**Breach of Contract –Disbursements**
**Plaintiff Snyder v. Defendant Queue in the Cloud and Defendant Shultz**

62.     Plaintiff Snyder hereby incorporates the preceding paragraphs by reference as

though fully set forth at length herein.

63.     As mentioned above, on January 1, 2012, Plaintiff Snyder and Defendant Shultz

entered into the First Operating Agreement whereby Plaintiff Snyder received a fifty (50) percent

interest in Queue in the Cloud.

64.     At all times relevant hereto, Plaintiff Snyder was in full compliance with the

terms of the First Operating Agreement.

65.     On or about January 1, 2014, Plaintiff Snyder and Defendant Shultz agreed that as

owners of Queue in the Cloud each month both Plaintiff Snyder and Defendant Shultz would

receive a ten-thousand-dollar ($10,000.00) disbursement from Queue in the Cloud on or about

the first day of each month.

66.     Plaintiff Snyder relied upon this agreement to receive a ten-thousand-dollar

($10,000.000) disbursement to provide not only for himself, but for his family as well.

67.     Since Plaintiff Snyder was wrongfully terminated on December 14, 2017, he has

not received his monthly disbursement from Queue in the Cloud for the month of January 2018.

68.     Based upon information and or belief, Plaintiff Snyder believes that he will no

longer receive any further monthly disbursements from Queue in the Cloud.

69.     In addition to the monthly disbursements that Plaintiff Snyder and Defendant

Shultz agreed to, both Plaintiff Snyder and Defendant Shultz agreed to have Queue in the Cloud

provide an end of year disbursement.

70.     As of the date of the filing of this Complaint Plaintiff Snyder has not received his

end of the year disbursement from Queue in the Cloud.

71.     Based upon information or belief, Plaintiff Snyder believes that he will not

receive his end of the year disbursements for the 2017 year from Queue in the Cloud.

WHEREFORE, Plaintiff Snyder respectfully demands judgment in his favor against the

Defendant in an amount in excess of $75,000.00, plus interest, costs, and any other relief that this

Honorable Court deems just and appropriate.

### COUNT IV
### Wrongful Termination
### Plaintiff Snyder v. Defendant Queue in the Cloud and Defendant Shultz

72.     Plaintiff Snyder hereby incorporates the preceding paragraphs by reference as

though fully set forth at length herein.

73.     On December 14, 2017, Defendant Shultz acted retaliatory and pretextually by

terminating Plaintiff Snyder's position with Queue in the Cloud, and deprived him of the value

and rights attendant to his ownership of fifty (50) percent of Queue in the Cloud, including by;

a. Pretextually and retaliatory terminating Plaintiff Snyder as an employee of Queue
   in the Cloud after he challenged the Defendants breaches of fiduciary duty;
b. Barring Plaintiff Snyder from any role in corporate decision making;
c. Misrepresenting to employees of Queue in the Cloud that Plaintiff Snyder was
   terminated for failing to meet sales goals; and
d. Vindictively terminating Plaintiff Snyder and his family's health insurance
   immediately, without notice, and while Defendant Shultz knew that Plaintiff
   Snyder's family was covered under the Queue in the Cloud company plan.

74.     As a Queue in the Cloud stockholder and even if arguing arguendo that Defendant Shultz is a majority shareholder of Queue in the Cloud, Defendant Shultz owes a duty of utmost good faith and loyalty to Plaintiff Snyder, as both a shareholder and employee.

75.     In furtherance of his duty, Defendant Shultz, as a shareholder, cannot use the corporate process to deny Plaintiff Snyder the right to participate in Queue in the Cloud or to prevent him from receiving amounts owed to him, including monthly distributions.

76.     Defendant Shultz's actions have no legitimate corporate purpose.

77.     As a direct and proximate result of Defendant Shultz's actions, Plaintiff Snyder has individually suffered and will continue to suffer damage, including loss of employment and income, and the expense to remedy Defendant Shultz's on-going misconduct.

78.     Defendant Shultz's misconduct is willful, wanton and egregious, evidencing an intentional disregard for his fiduciary and lawful obligations. Accordingly, punitive damages are warranted.

WHEREFORE, Plaintiff Snyder respectfully demands judgment in his favor against the Defendant in an amount in excess of $75,000.00, plus punitive damages, interest, costs, and any other relief that this Honorable Court deems just and appropriate.

**COUNT V**
**Quantum Meruit**
**Plaintiff Snyder v. Defendant Queue in the Cloud and Defendant Shultz**

79.     Plaintiff Snyder hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

80.     As mentioned above, on January 1, 2012, Plaintiff Snyder and Defendant Shultz entered into the First Operating Agreement whereby Plaintiff Snyder received a fifty (50) percent interest in Queue in the Cloud. (**See Exhibit A**).

81.     At all times relevant hereto, Plaintiff Snyder has acted in full compliance with the First Operating Agreement.

82.     In accordance with the terms of the First Operating Agreement, Plaintiff Snyder received a fifty (50) percent interest in Queue in the Cloud.

83.     Acting with the most utmost good faith and loyalty to Defendant Shultz and Queue in the Cloud, Plaintiff Snyder tirelessly worked around the clock to build-up Queue in the Cloud.

84.     Now that Plaintiff Snyder has been terminated from Queue in the Cloud, Defendant Shultz has been unjustly enriched by being able to enjoy the fruits of Plaintiff Snyder's hard work and labor.

85.     Plaintiff Snyder has not received any benefit from Defendant Shultz since his termination on December 14, 2017.

86.     Defendant Shultz has refused to reinstate Plaintiff Snyder's position with Queue in the Cloud.

87.     Defendant Shultz has therefore been unjustly enriched in an amount believed to be in excess of $75,000.00.

WHEREFORE, Plaintiff Snyder respectfully demands judgment in his favor against the Defendant in an amount in excess of $75,000.00, plus interest, costs, and any other relief that this Honorable Court deems just and appropriate.

### COUNT VI
### Breach of Good Faith and Fair Dealing
### Plaintiff Snyder v. Defendant Shultz

88.     Plaintiff Snyder hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

89.     As mentioned above, on January 1, 2012, Plaintiff Snyder and Defendant Shultz entered into the First Operating Agreement whereby Plaintiff Snyder received a fifty (50) percent interest in Queue in the Cloud. (**See Exhibit A**).

90.     The First Operating Agreement between Plaintiff Snyder and Defendant Shultz required Defendants to exercise, at all times, the utmost good faith and to deal fairly at all times with Plaintiff in carrying out its duties under the agreement by reason of the covenant of good faith and fair dealing that is implied in every Pennsylvania contract.

91.     By Defendant Shultz's conduct as described above including unilaterally removing Plaintiff Snyder from all company bank accounts and corporate decision making, Defendant Shultz has significantly eliminated any benefit of the First Operating Agreement for Plaintiff Snyder and has breached the implied covenant of good faith and fair dealing, causing and continuing to cause Plaintiff Snyder substantial damage.

92.     At all times relevant hereto, Plaintiff Snyder has acted in full compliance with the contract.

93.     Therefore, Defendant Shultz has breached his duty of good faith and fair dealing.

WHEREFORE, Plaintiff Snyder demands judgment in its favor against Defendant Shultz in an amount in excess of $75,000.00, plus punitive damages, interest, costs, and any other relief that this Honorable Court deems just and appropriate.

### COUNT VII
### Breach of Fiduciary Duty
### Plaintiff Snyder v. Defendant Shultz

94.     Plaintiff Snyder hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

95.     As mentioned above, on January 1, 2012, Plaintiff Snyder and Defendant Shultz entered into the First Operating Agreement whereby Plaintiff Snyder received a fifty (50) percent interest in Queue in the Cloud. (**See Exhibit A**).

96.     As partners of the company, each of the parties owe certain fiduciary duties of care loyalty, and good faith to each other.

97.     Defendant Shultz's fiduciary duties to Plaintiff Snyder include, but are not limited to, obligations to exercise good business judgment to act prudently in the operation of the company's business, to discharge their actions in good faith, to act in the best interests of the company, and to put the interests of the company before their own.

98.     Defendant Shultz breached his fiduciary duties of care by, among other things terminating Plaintiff Snyder, routinely mismanaging the company, and failing to comply with the terms and conditions of the First Operating Agreement and applicable corporate law.

99.     Defendant Shultz breached his duties of loyalty and good faith by, among other things, intentionally and deliberately refusing Plaintiff's requests for access to company assets and records, such as financial documentation, and seeking to disenfranchise and freeze out Plaintiff Snyder from partnership activity.

100.    This is a breach of Defendant Shultz's fiduciary duties owed to the Plaintiff Snyder.

101.    Plaintiff  Snyder has been damaged and continues to be harmed by Defendant Shultz's breach of his fiduciary duties.

WHEREFORE, Plaintiff Snyder respectfully requests that this Honorable Court enter an Order requiring dissolution of the Queue in the Cloud LLC and liquidation of all assets.

## COUNT VIII
### Defamation and Defamation Per Se
### Plaintiff Snyder v. Plaintiff Shultz

102.   Plaintiff Snyder hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

103.   On December 14, 2017, Plaintiff Snyder was wrongfully terminated effective immediately for retaliatory and pretextual reasons.

104.   Defendant Shultz falsely and repeatedly told others Plaintiff Snyder's termination was the result of his failure to meet sales and new client revenue goals.

105.   Defendant Shultz knows that these statements are false and per se defamatory, but he published them to third parties, who understood the defamatory meaning of these statements.

106.   Plaintiff Snyder has been greatly harmed by these statements, including harm to his personal reputation and his reputation in the industry where he has spent the past 15 years of his life.

107.   It is not yet known how far Defendant Shultz's lies have spread and what additional harm Plaintiff Snyder will endure. Discovery will confirm the extent of Defendant Shultz's false and defamatory statements and additional harm Plaintiff Snyder has suffered.

WHEREFORE, Plaintiff Snyder demands judgment in its favor against Defendant Shultz in an amount in excess of $75,000.00, plus punitive damages, interest, costs, and any other relief that this Honorable Court deems just and appropriate.

## COUNT IX
### Intentional Infliction of Emotional Distress
### Plaintiff Snyder v. Defendant Shultz

108.   Plaintiff Snyder hereby incorporates the preceding paragraphs by reference as though fully set forth at length herein.

109.   Defendant Shultz knows that Plaintiff Snyder provides not only for himself, but for his family as well using his Queue in the Cloud disbursements.

110.   Additionally, Defendant Shultz knows that Plaintiff Snyder uses the health insurance policy provided to him by Queue in the Cloud for himself and his family.

111.   On or about the date of December 14, 2017, Defendant Shultz terminated Plaintiff Snyder's family health insurance plan without any notice or warning to Plaintiff Snyder.

112.   Plaintiff Snyder only became aware of his coverage termination when he took one his children to a medical appointment and was denied coverage for treatment.

113.   As a result of Defendant Shultz's misconduct, Plaintiff Snyder has suffered and continues to suffer emotional distress, including, concerns for the welfare of his children, his wife and himself as well as severe anxiety from the loss of his family's main source of income.

114.   The misconduct of Defendant Shultz, is extreme, outrageous, and warrants punitive damages.

WHEREFORE, Plaintiff Snyder demands judgment in its favor against Defendant Shultz in an amount in excess of $75,000.00, plus punitive damages, interest, costs, and any other relief that this Honorable Court deems just and appropriate.

Respectfully Submitted,

FREUNDLICH & LITTMAN, LCC

By: _____
Gregory C. Littman, Esquire
I.D. # 306806
ATTORNEY FOR PLAINTIFF

1425 Walnut Street Suite 200
Philadelphia, PA 19102

DATE: January 29, 2018

(T) 215-545-8500
(F) 215-545-8510

# EXHIBIT "A"

# Queue in the Cloud LLC

## Operating Agreement

A. THIS OPERATING AGREEMENT of Queue in the Cloud LLC (the "Company") is entered into as of the date set forth on the signature page hereto by each of the persons named in Exhibit A hereto (referred to individually as a Member and collectively as the Members).

B. The Members have formed a limited liability company under the laws of the Commonwealth of Pennsylvania (Title 15, Chapter 89 of the Pennsylvania Consolidated Statutes, hereafter "the Pennsylvania Limited Liability Company Act"). The certificate of organization of the Company filed with the Pennsylvania Department of State are hereby adopted and approved by the Members.

C. The Members enter into this agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, the Members agree as follows:

### ARTICLE 1: DEFINITIONS

Capitalized terms used in this agreement have the meanings specified in this Article or elsewhere in this agreement and when not so defined shall have the meanings set forth in the Pennsylvania Limited Liability Company Act.

"Capital Contribution" means the amount of cash, property or services contributed to the Company.

"Company" means Queue in the Cloud LLC, a Pennsylvania limited liability company.

"Member" means a Person who acquires Membership Interests, as permitted under this agreement, and who becomes or remains a Member.

"Membership Interests" means either Percentage Interest or Units, based on how ownership in the Company is expressed on Exhibit A.

"Percentage Interest" means a percent ownership in the Company entitling the holder to an economic and voting interest in the Company.

"Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

"Unit" means a unit of ownership in the Company entitling the Member holding such Unit to an economic interest and a voting interest in the Company.

## ARTICLE 2: CAPITAL AND CAPITAL CONTRIBUTIONS

2.1 **Initial Capital Contributions and Membership Interests**. The Capital Contributions of the initial Members, as well as the Membership Interests of each Member, are listed in Exhibit A, which is made part of this agreement. Membership Interests in the Company may be expressed either in Units or directly in Percentage Interests.

2.2 **Subsequent Contributions**. No Member shall be obligated to make additional capital contributions unless unanimously agreed by all the Members.

2.3 **Capital Accounts**. Individual capital accounts may be maintained for each Member consisting of that Member's Capital Contribution, (1) increased by that Member's share of profits, (2) decreased by that Member's share of losses and company expenses, (3) decreased by that Member's distributions and (4) adjusted as required in accordance with applicable tax laws.

2.4 **Interest**. No interest shall be paid on Capital Contributions or on the balance of a Member's capital account.

2.5 **Limited Liability**. A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the company except as otherwise provided in this agreement or as required by law.

## ARTICLE 3: ALLOCATIONS AND DISTRIBUTIONS

3.1 **Allocations**. The profits and losses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, pro rata in proportion to relative Membership Interests held by each Member.

3.2 **Distributions**. The Company shall have the right to make distributions of cash and property to the Members pro rata based on the relative Membership Interests. The timing and amount of distributions shall be determined by the Members in accordance with Pennsylvania law.

## ARTICLE 4: MANAGEMENT

4.1 **Management**. The business of the Company shall be managed by the Members. In the event of a dispute between Members, final determination shall be made by a vote of the majority of the Members (unless a greater percentage is required in this Agreement or under

-2-

Pennsylvania law). Any Member may bind the Company in all matters in the ordinary course of business.

4.2 **Banking**. The Members are authorized to set up one or more bank accounts and are authorized to execute any banking resolutions provided by the institution where the accounts are being set up. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company.

4.3 **Officers**. The Members are authorized to appoint one or more officers from time to time. The officers shall hold office until their successors are chosen and qualified. Subject to any employment agreement entered into between the officer and the Company, an officer shall serve at the pleasure of the Members. The current officers of the Company are listed on Exhibit B.

## ARTICLE 5: ACCOUNTS AND ACCOUNTING

5.1 **Accounts**. Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying on reasonable notice by any Member or their authorized representatives during normal business hours for purposes reasonably related to the interest of such person as a Member. The costs of such inspection and copying shall be borne by the Member.

5.2 **Records**. At all times during the term of existence of the Company, and beyond that term if the Members deems it necessary, the Members shall keep or cause to be kept the following:

(a) A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution, the amount and terms of any agreed upon future Capital Contribution, and Membership Interest of each Member;

(b) A copy of the articles of organization and any amendments;

(c) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the three most recent taxable years; and

(d) An original executed copy or counterparts of this agreement and any amendments.

5.3 **Income Tax Returns**. Within 45 days after the end of each taxable year, the Company shall use its best efforts to send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year.

5.4 **Tax Matters Member.** Harry F. Shultz, III shall act as tax matters member of the Company to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

## ARTICLE 6: MEMBERSHIP–MEETINGS, VOTING

6.1 **Members and Voting Rights.** Members shall have the right and power to vote on all matters with respect to which this agreement or Pennsylvania law requires or permits such Member action. Voting shall be based on Membership Interests. Unless otherwise stated in this Agreement or under Pennsylvania law, the vote of the Members holding a majority of the Membership Interests shall be required to approve or carry an action.

6.2 **Meetings.** Regular or annual meetings of the Members are not required but may be held at such time and place as the Members deem necessary or desirable for the reasonable management of the Company.

In any instance in which the approval of the Members is required under this agreement, such approval may be obtained in any manner permitted by Pennsylvania law, including by conference telephone or similar communications equipment. In addition, any action which could be taken at a meeting can be approved without a meeting and without notice if a consent in writing, stating the action to be taken, is signed by the holders of the minimum Membership Interest needed to approve the action.

## ARTICLE 7: WITHDRAWAL AND TRANSFERS OF MEMBERSHIP INTERESTS

7.1 **Withdrawal.** A Member may withdraw from the Company prior to the dissolution and winding up of the Company with the unanimous consent of the other Members, or if such Member transfers or assigns all of his or her Membership Interests pursuant to Section 7.2 below. A Member which withdraws pursuant to this Section 7.1 shall be entitled to a distribution in an amount equal to such Member's Capital Account.

7.2 **Restrictions on Transfer.** A Member shall not transfer any Membership Interests, whether now owned or later acquired, unless all of the Members consent to such transfer. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A person which acquires Membership Interests in accordance with this section shall be admitted as a Member of the Company after the person has agreed to be bound by the terms of this Operating Agreement by executing a consent in the form of Exhibit C.

## ARTICLE 8: DISSOLUTION AND WINDING UP

8.1 **Dissolution.** The Company shall be dissolved upon the first to occur of the following events:

(a) The vote of Members holding all of the outstanding Membership Interests to dissolve the Company.

(b) Entry of a decree of judicial dissolution under the Pennsylvania Limited Liability Company Act.

(c) At any time there are no Members, provided that the Company is not dissolved and is not required to be wound up if, within 90 days after the occurrence of the event that terminated the continued membership of the last remaining Member, the legal representative of the last remaining Member agrees in writing to continue the Company and to the admission of the legal representative of such Member or its assignee to the Company as a Member, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member.

8.2 **No automatic dissolution upon certain events.** Neither the death, incapacity, disassociation, bankruptcy or withdrawal of a Member shall automatically cause a dissolution of the Company.

## ARTICLE 9: INDEMNIFICATION

9.1 **Indemnification.** The Company shall have the power to indemnify any Person who was or is a party, or who is threatened to be made a party, to any proceeding by reason of the fact that such Person was or is a Member, Manager, officer, employee, or other agent of the Company, or was or is serving at the request of the Company as a director, manager, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by such Person in connection with such proceeding, if such Person acted in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, and, in the case of a criminal proceeding, such Person had no reasonable cause to believe that the Person's conduct was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

To the extent that an agent of the Company has been successful on the merits in defense of any proceeding, or in defense of any claim, issue, or matter in any such proceeding, the agent shall be indemnified against expenses actually and reasonably incurred in connection with the

-5-

proceeding. In all other cases, indemnification shall be provided by the Company only if authorized in the specific case unanimously by all of the Members.

"Proceeding," as used in this section, means any threatened, pending, or completed action or proceeding, whether civil, criminal, administrative, or investigative.

9.2 **Expenses**. Expenses of each Person indemnified under this agreement actually and reasonably incurred in connection with the defense or settlement of a proceeding may be paid by the Company in advance of the final disposition of such proceeding, as authorized by the Members who are not seeking indemnification upon receipt of an undertaking by such Person to repay such amount unless it shall ultimately be determined that such Person is entitled to be indemnified by the Company.

"Expenses," as used in this section, includes, without limitation, attorney fees and expenses of establishing a right to indemnification, if any, under this section.

## ARTICLE 10: GENERAL PROVISIONS

10.1 **Entire Agreement; Amendment**. This agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all of the Members. This agreement replaces and supersedes all prior written and oral agreements by and among the Members.

10.2 **Governing Law; Severability**. This agreement shall be construed and enforced in accordance with the internal laws of the State of Pennsylvania. If any provision of this agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this agreement shall remain in effect.

10.3 **Benefit**. This agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

10.4 **Number and Gender**. Whenever used in this agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this agreement may require.

10.5 **No Third Party Beneficiary**. This agreement is made solely for the benefit of the parties to this agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this agreement.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Operating Agreement as of the date below.

Dated: 1/1/2012

Harry P. Shultz, III

Gregory M. Snyder

-8-

EXHIBIT A

## MEMBERS

The following persons are the initial Members of the Company, and their initial capital contributions and ownership is set forth below.

| Name | Capital Contribution ($) | Percentage Interest |
|------|--------------------------|---------------------|
| Harry F. Shultz, III | $0.00 | 50% |
| Gregory M. Snyder | $0.00 | 50% |

-9-

EXHIBIT B

## OFFICERS

The following person(s) are elected as officers of the Company:

None.

# EXHIBIT "B"

# Queue in the Cloud LLC

## Operating Agreement

A. THIS OPERATING AGREEMENT of Queue in the Cloud LLC (the "Company") is entered into as of the date set forth on the signature page hereto by each of the persons named in Exhibit A hereto (referred to individually as a Member and collectively as the Members).

B. The Members have formed a limited liability company under the laws of the Commonwealth of Pennsylvania (Title 15, Chapter 89 of the Pennsylvania Consolidated Statutes, hereafter "the Pennsylvania Limited Liability Company Act"). The certificate of organization of the Company filed with the Pennsylvania Department of State are hereby adopted and approved by the Members.

C. The Members enter into this agreement to provide for the governance of the Company and the conduct of its business, and to specify their relative rights and obligations.

NOW THEREFORE, the Members agree as follows:

### ARTICLE 1: DEFINITIONS

Capitalized terms used in this agreement have the meanings specified in this Article or elsewhere in this agreement and when not so defined shall have the meanings set forth in the Pennsylvania Limited Liability Company Act.

"Capital Contribution" means the amount of cash, property or services contributed to the Company.

"Company" means Queue in the Cloud LLC, a Pennsylvania limited liability company.

"Member" means a Person who acquires Membership Interests, as permitted under this agreement, and who becomes or remains a Member.

"Membership Interests" means either Percentage Interest or Units, based on how ownership in the Company is expressed on Exhibit A.

"Percentage Interest" means a percent ownership in the Company entitling the holder to an economic and voting interest in the Company.

"Person" means an individual, partnership, limited partnership, trust, estate, association, corporation, limited liability company, or other entity, whether domestic or foreign.

"Unit" means a unit of ownership in the Company entitling the Member holding such Unit to an economic interest and a voting interest in the Company.

## ARTICLE 2: CAPITAL AND CAPITAL CONTRIBUTIONS

2.1 **Initial Capital Contributions and Membership Interests.** The Capital Contributions of the initial Members, as well as the Membership Interests of each Member, are listed in Exhibit A, which is made part of this agreement. Membership Interests in the Company may be expressed either in Units or directly in Percentage Interests.

2.2 **Subsequent Contributions.** No Member shall be obligated to make additional capital contributions unless unanimously agreed by all the Members.

2.3 **Capital Accounts.** Individual capital accounts may be maintained for each Member consisting of that Member's Capital Contribution, (1) increased by that Member's share of profits, (2) decreased by that Member's share of losses and company expenses, (3) decreased by that Member's distributions and (4) adjusted as required in accordance with applicable tax laws.

2.4 **Interest.** No interest shall be paid on Capital Contributions or on the balance of a Member's capital account.

2.5 **Limited Liability.** A Member shall not be bound by, or be personally liable for, the expenses, liabilities, or obligations of the company except as otherwise provided in this agreement or as required by law.

## ARTICLE 3: ALLOCATIONS AND DISTRIBUTIONS

3.1 **Allocations.** The profits and losses of the Company and all items of Company income, gain, loss, deduction, or credit shall be allocated, for Company book purposes and for tax purposes, pro rata in proportion to relative Membership Interests held by each Member.

3.2 **Distributions.** The Company shall have the right to make distributions of cash and property to the Members pro rata based on the relative Membership Interests. The timing and amount of distributions shall be determined by the Members in accordance with Pennsylvania law.

## ARTICLE 4: MANAGEMENT

4.1 **Management.** The business of the Company shall be managed by the Members. In the event of a dispute between Members, final determination shall be made by a vote of the majority of the Members (unless a greater percentage is required in this Agreement or under

Pennsylvania law). Any Member may bind the Company in all matters in the ordinary course of business.

4.2 **Banking.** The Members are authorized to set up one or more bank accounts and are authorized to execute any banking resolutions provided by the institution where the accounts are being set up. All funds of the Company shall be deposited in one or more accounts with one or more recognized financial institutions in the name of the Company.

4.3 **Officers.** The Members are authorized to appoint one or more officers from time to time. The officers shall hold office until their successors are chosen and qualified. Subject to any employment agreement entered into between the officer and the Company, an officer shall serve at the pleasure of the Members. The current officers of the Company are listed on Exhibit B.

## ARTICLE 5: ACCOUNTS AND ACCOUNTING

5.1 **Accounts.** Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying on reasonable notice by any Member or their authorized representatives during normal business hours for purposes reasonably related to the interest of such person as a Member. The costs of such inspection and copying shall be borne by the Member.

5.2 **Records.** At all times during the term of existence of the Company, and beyond that term if the Members deems it necessary, the Members shall keep or cause to be kept the following:

(a) A current list of the full name and last known business or residence address of each Member, together with the Capital Contribution, the amount and terms of any agreed upon future Capital Contribution, and Membership Interest of each Member;

(b) A copy of the articles of organization and any amendments;

(c) Copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the three most recent taxable years; and

(d) An original executed copy or counterparts of this agreement and any amendments.

5.3 **Income Tax Returns.** Within 45 days after the end of each taxable year, the Company shall use its best efforts to send to each of the Members all information necessary for the Members to complete their federal and state income tax or information returns and a copy of the Company's federal, state, and local income tax or information returns for such year.

5.4 **Tax Matters Member.** Harry F. Shultz, III shall act as tax matters member of the Company to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities and to expend Company funds for professional services and costs associated therewith.

## ARTICLE 6: MEMBERSHIP--MEETINGS, VOTING

6.1 **Members and Voting Rights.** Members shall have the right and power to vote on all matters with respect to which this agreement or Pennsylvania law requires or permits such Member action. Voting shall be based on Membership Interests. Unless otherwise stated in this Agreement or under Pennsylvania law, the vote of the Members holding a majority of the Membership Interests shall be required to approve or carry an action.

6.2 **Meetings.** Regular or annual meetings of the Members are not required but may be held at such time and place as the Members deem necessary or desirable for the reasonable management of the Company.

In any instance in which the approval of the Members is required under this agreement, such approval may be obtained in any manner permitted by Pennsylvania law, including by conference telephone or similar communications equipment. In addition, any action which could be taken at a meeting can be approved without a meeting and without notice if a consent in writing, stating the action to be taken, is signed by the holders of the minimum Membership Interest needed to approve the action.

## ARTICLE 7: WITHDRAWAL AND TRANSFERS OF MEMBERSHIP INTERESTS

7.1 **Withdrawal.** A Member may withdraw from the Company prior to the dissolution and winding up of the Company with the unanimous consent of the other Members, or if such Member transfers or assigns all of his or her Membership Interests pursuant to Section 7.2 below. A Member which withdraws pursuant to this Section 7.1 shall be entitled to a distribution in an amount equal to such Member's Capital Account.

7.2 **Restrictions on Transfer.** A Member shall not transfer any Membership Interests, whether now owned or later acquired, unless all of the Members consent to such transfer. A person may acquire Membership Interests directly from the Company upon the written consent of all Members. A person which acquires Membership Interests in accordance with this section shall be admitted as a Member of the Company after the person has agreed to be bound by the terms of this Operating Agreement by executing a consent in the form of Exhibit C.

## ARTICLE 8: DISSOLUTION AND WINDING UP

8.1 **Dissolution.** The Company shall be dissolved upon the first to occur of the following events:

(a) The vote of Members holding all of the outstanding Membership Interests to dissolve the Company.

(b) Entry of a decree of judicial dissolution under the Pennsylvania Limited Liability Company Act.

(c) At any time there are no Members, provided that the Company is not dissolved and is not required to be wound up if, within 90 days after the occurrence of the event that terminated the continued membership of the last remaining Member, the legal representative of the last remaining Member agrees in writing to continue the Company and to the admission of the legal representative of such Member or its assignee to the Company as a Member, effective as of the occurrence of the event that terminated the continued membership of the last remaining Member.

8.2 **No automatic dissolution upon certain events.** Neither the death, incapacity, disassociation, bankruptcy or withdrawal of a Member shall automatically cause a dissolution of the Company.

## ARTICLE 9: INDEMNIFICATION

9.1 **Indemnification.** The Company shall have the power to indemnify any Person who was or is a party, or who is threatened to be made a party, to any proceeding by reason of the fact that such Person was or is a Member, Manager, officer, employee, or other agent of the Company, or was or is serving at the request of the Company as a director, manager, officer, employee, or other agent of another limited liability company, corporation, partnership, joint venture, trust, or other enterprise, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred by such Person in connection with such proceeding, if such Person acted in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, and, in the case of a criminal proceeding, such Person had no reasonable cause to believe that the Person's conduct was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that such Person reasonably believed to be in the best interests of the Company, or that the Person had reasonable cause to believe that the Person's conduct was unlawful.

To the extent that an agent of the Company has been successful on the merits in defense of any proceeding, or in defense of any claim, issue, or matter in any such proceeding, the agent shall be indemnified against expenses actually and reasonably incurred in connection with the

proceeding. In all other cases, indemnification shall be provided by the Company only if authorized in the specific case unanimously by all of the Members.

"Proceeding," as used in this section, means any threatened, pending, or completed action or proceeding, whether civil, criminal, administrative, or investigative.

9.2 **Expenses.** Expenses of each Person indemnified under this agreement actually and reasonably incurred in connection with the defense or settlement of a proceeding may be paid by the Company in advance of the final disposition of such proceeding, as authorized by the Members who are not seeking indemnification upon receipt of an undertaking by such Person to repay such amount unless it shall ultimately be determined that such Person is entitled to be indemnified by the Company.

"Expenses," as used in this section, includes, without limitation, attorney fees and expenses of establishing a right to indemnification, if any, under this section.

## ARTICLE 10: GENERAL PROVISIONS

10.1 **Entire Agreement; Amendment.** This agreement constitutes the whole and entire agreement of the parties with respect to the subject matter of this agreement, and it shall not be modified or amended in any respect except by a written instrument executed by all of the Members. This agreement replaces and supersedes all prior written and oral agreements by and among the Members.

10.2 **Governing Law; Severability.** This agreement shall be construed and enforced in accordance with the internal laws of the State of Pennsylvania. If any provision of this agreement is determined by any court of competent jurisdiction or arbitrator to be invalid, illegal, or unenforceable to any extent, that provision shall, if possible, be construed as though more narrowly drawn, if a narrower construction would avoid such invalidity, illegality, or unenforceability or, if that is not possible, such provision shall, to the extent of such invalidity, illegality, or unenforceability, be severed, and the remaining provisions of this agreement shall remain in e:ffect.

10.3 **Benefit.** This agreement shall be binding on and inure to the benefit of the parties and their heirs, personal representatives, and permitted successors and assigns.

10.4 **Number and Gender.** Whenever used in this agreement, the singular shall include the plural and the plural shall include the singular, and the neuter gender shall include the male and female as well as a trust, firm, company, or corporation, all as the context and meaning of this agreement may require.

10.5 **No Third Party Beneficiary.** This agreement is made solely for the benefit of the parties to this agreement and their respective permitted successors and assigns, and no other person or entity shall have or acquire any right by virtue of this agreement.

IN WITNESS WHEREOF, the parties have executed or caused to be executed this Operating Agreement as of the date below.

Dated: 1/1/2012

Harry P. Shultz, III

Gregory M. Snyder

EXHIBIT A

## MEMBERS

The following persons are the Members of the Company, and their capital contributions and ownership is set forth below:

| Name | Capital Contribution ($) | Percentage Interest |
|------|--------------------------|---------------------|
| Harry F. Shultz, III | $81,926.62 | 59% |
| Gregory M. Snyder | $56,760.62 | 41% |

EXHIBIT B

## OFFICERS

The following person(s) are elected as officers of the Company:

President:    Harry F Shultz, III

# EXHIBIT "C"



FREUNDLICH & LITTMAN, LLC.
ATTORNEYS AT LAW

AUSTIN R. FREUNDLICH
GREGORY C. LITTMAN
JONATHAN D. ROSENAU
MATTHEW STRAUSKULAGE

ATTORNEYS LICENSED IN PA & NJ

December 22, 2017

*Via U.S. Overnight Mail, U.S. Certified Mail, and U.S. Regular Mail*

Harry F. Shultz, III
435 Komen Ct.
Collegeville, PA 19426

Queue in the Cloud LLC
d/b/a BC in the Cloud
3238 W. Germantown Pike
Eagleville, PA 19403

## RE: QUEUE IN THE CLOUD LLC MATERIAL BREACH OF
## OPERATING AGREETEMNT, CEASE AND DESIST DEMAND

Dear Mr. Shultz:

Please be advised that the law firm of Freundlich & Littman, LLC., has been retained by Mr. Gregory Snyder (hereinafter "Mr. Snyder") in connection with pursuing an action against you on his behalf and that of Queue in the Cloud LLC for breach of fiduciary duties, breach of contract, and breach of the Operating Agreement. Please cease all communications with Mr. Snyder and direct all future correspondence to my office.

As you are aware, Mr. Snyder entered into an Operating Agreement (hereinafter "Agreement") with you on or about January 1, 2012. (A true and correct copy of the Agreement is attached hereto as **Exhibit "A"**). According to the Agreement, Mr. Snyder received a fifty (50) percent equity stake in Queue in the Could LLC (See **Exhibit "A"**). Per §4.1 of the Agreement, Mr. Snyder is therefore entitled to manage the business of Queue in the Cloud LLC. (See **Exhibit "A"**). Moreover, per §1 of the Agreement, Mr. Snyder holds both a fifty (50) percent Membership interest and voting interest in Queue in the Could LLC. Furthermore, per §7.1 of the Agreement a member may not be removed or withdrawn without the unanimous consent of all the members of Queue in the Cloud LLC.

On or about Friday December 15, 2017, you informed Mr. Snyder that his position with Queue in the Cloud LLC was terminated. Per the terms of the Agreement, you did not and do not have the power or authority to take such an action. Furthermore, you removed Mr. Snyder from the Queue in the Cloud LLC bank accounts without the power or authority to take such an action.

1

Because of your actions, you are in material breach of the Queue in the Cloud LLC Operating Agreement. Specifically:

1. §2.3 Capital accounts; Individual capital accounts may be maintained for each Member consisting of that Member's capital contribution, (1) increased by that Member's share of profits, (2) decreased by that Member's share of losses and company expenses, (3) decreased by that Member's distributions and (4) adjusted as required in accordance with applicable tax laws.
2. §3.2 Distributions; The Company shall have the right to make distributions of cash and property to the members pro rata based on the relative Membership interests. The timing and amount of distributions shall be determined by the Members in accordance with Pennsylvania law.
3. §4.1 Management; The business of the Company shall be managed by the Members. In the event of a dispute between Members, final determination shall be made by a vote of the majority of the Members (unless a greater percentage is required in this Agreement or under Pennsylvania Law). Any member may bind the Company in all matters in the ordinary course of business.
4. §5.1 Accounts; Complete books of account of the Company's business, in which each Company transaction shall be fully and accurately entered, shall be kept at the Company's principal executive office and shall be open to inspection and copying on reasonable notice by any Member or their authorized representative during normal business hours for purposes reasonably related to the interest of such person as a Member. The cost of such inspection and copying shall be borne by the Member.
5. §6.1 Members and Voting Rights; Members shall have the right and power to vote on all matters with respect to which this Agreement or Pennsylvania law requires or permits such Member Action. Voting shall be based on Membership Interests. Unless otherwise stated in the Agreement or under Pennsylvania law, the vote of the Members holding a majority of the Membership Interests shall be required to approve or carry an action.
6. §7.1 Withdrawal; A Member may withdraw from the Company prior to the dissolution and winding up of the company with the unanimous consent of the other Members, or if such Member transfers or assigns all of his or her Membership interests pursuant to Section 7.2 below. A Member which withdraws pursuant to this section 7.1 shall be entitled to a distribution in the amount equal to such Member's Capital Account.

Because of your material breach of the Agreement, if you attempt to use company funds to pay for, or supplement the defense of your actions, you will be in material breach of Article 9: Indemnification. Per §9.1 you may not seek indemnification because your actions were and continue to be in bad faith.

Be advised that because you and Mr. Snyder are members you owe fiduciary duties to each other. Korman Corp. v. Franklin Town Corp., 34 Pa. D. &C.3d 495. Your obligation as a member to Mr. Snyder is heightened as you owe a duty of the finest loyalty and utmost good faith to one another. Bair v. Purcell, 500 F. Supp. 2d 468 (M.D. Pa. 2007). By refusing to include Mr. Snyder in any corporate decisions, and refusing to allow Mr. Snyder access to Queue in the Cloud property,